IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE
*Filed Electronically*

UNITED STATES OF AMERICA,

    Plaintiff,

    v.

JOHN RUSH, M.D.,
PHYSICIANS' HEALTH GROUP OF LOUISVILLE, LLC,
PHYSICIANS HEALTH GROUP OF KENTUCKY, PLLC,
ARIZONA HEALTH SERVICES, PLLC,
ARTHRITIS STRATEGIES OF TEXAS, PLLC,
WOODLANDS HEALTH GROUP, PLLC,
ACTIVE LIFE HEALTH OF ALPHARETTA, LLC,
ACTIVE LIFE HEALTH OF CHARLOTTE, PLLC,
ACTIVE LIFE HEALTH OF CINCINNATI, LLC,
ACTIVE LIFE HEALTH OF COLUMBIA, LLC,
ACTIVE LIFE HEALTH OF COLUMBUS, LLC,
ACTIVE LIFE HEALTH OF GARDEN CITY MEDICAL, PLLC,
ACTIVE LIFE HEALTH OF N.Y., P.C.,
MEDICAL OFFICES OF NEW JERSEY SHORE, LLC, and
ARTHRITIS KNEE PAIN CENTERS, LLC,

    Defendants.

**JURY DEMAND**

Case No. 3:25-CV-200-CRS

## **COMPLAINT**

1.    The United States of America brings this action to enforce provisions of the False Claims Act (FCA), 31 U.S.C. §§ 3729–3733, and common law theories of unjust enrichment and payment by mistake against Defendants John Rush, M.D. (Rush), and his businesses, collectively referred to as the Arthritis Knee Pain Centers (AKPC), and specifically defined as Physicians' Health Group of Louisville, LLC, Physicians Health Group of Kentucky, PLLC, Arizona Health Services, PLLC, Arthritis Strategies of Texas, PLLC, Woodlands Health Group, PLLC, Active Life Health of Alpharetta, LLC, Active Life Health of Charlotte, PLLC, Active Life Health of Cincinnati, LLC, Active Life Health of Columbia, LLC, Active Life Health of Columbus, LLC,

Active Life Health of Garden City Medical, PLLC, Active Life Health of N.Y., P.C., Medical Offices of New Jersey Shore, LLC, and Arthritis Knee Pain Centers, LLC (formerly Healthcare Media, LLC).

2.    This action arises from false and/or fraudulent claims Rush and AKPC submitted or caused to be submitted related to medical services provided to Medicare beneficiaries with knee osteoarthritis.

3.    Knee osteoarthritis is a degenerative joint disease, in which the tissues in the knee joint break down over time, causing joint pain.

4.    Knee osteoarthritis may affect both knees (bilateral) or only one (unilateral).

5.    AKPC offers its patients with knee osteoarthritis various treatments, including, but not limited to, viscosupplement and corticosteroid injections. A viscosupplement is a gel-like substance, intended to act like a lubricant and shock absorber in the knee joint to help it work properly and reduce knee pain. Corticosteroids are an anti-inflammatory that may reduce swelling and pain in the knee joint.

6.    Before injecting a viscosupplement or corticosteroid into the knee joint, an AKPC physician injects a small amount of contrast dye (usually 2 milliliters) into the patient's knee. Using fluoroscopic guidance (a type of video x-ray), the provider then visually confirms whether the contrast spreads throughout the knee joint, in which case the needle is properly placed inside it.

7.    As described below, between April 15, 2019, and the date of this filing (the "Relevant Period"), Defendants knowingly submitted or caused the submission of millions of dollars in false and/or fraudulent claims to Medicare for:

a.  knee injections which were medically unreasonable and unnecessary because they were not provided to patients with bilateral knee osteoarthritis during the same patient visit, but instead over two patient visits so Rush and AKPC could make more money from them. *See* Exhibit A. Defendants further knowingly received and retained a substantial Medicare overpayment related to these false claims.

b.  millions of milliliters (ml) of more contrast than they actually used. *See* Exhibits B and C. Defendants further knowingly received and retained a substantial Medicare overpayment related to these false claims.

8.    The United States suffered millions of dollars in damages when Medicare paid for such false or fraudulent claims. The United States brings this action pursuant to the FCA and federal common law, to recover damages, as well as applicable civil penalties and treble damages.

**PARTIES**

9.    Plaintiff United States brings this action on behalf of the U.S. Department of Health and Human Services (HHS) and the Centers for Medicare & Medicaid Services (CMS), which administers the Medicare program, 42 U.S.C. §§ 1395 et seq. (Medicare).

10.    Defendant John Rush, M.D. is the Chief Executive Officer, Chief Medical Officer, and owner of each AKPC clinic. Rush resides in Potomac, MD.

11.    Defendant Physicians' Health Group of Louisville, LLC is:

a.  a Kentucky limited liability company that operates at 6400 Dutchmans Parkway, Louisville, KY 40205;

b.  owned and controlled by Rush;

c.  the AKPC clinic in Louisville, KY.

3

12.   Defendant Physicians Health Group of Kentucky, PLLC is:

    a.   a Kentucky professional limited liability company with a principal address of

       1019 Majestic Drive, Lexington, KY 40513;

    b.   owned and controlled by Rush;

    c.   the AKPC clinic in Lexington, KY.

13.   Defendant Arizona Health Services, PLLC is:

    a.   an Arizona professional limited liability company with a principal address of

       4040 E. Camelback Road, #155, Phoenix, AZ 85018;

    b.   owned and controlled by Rush;

    c.   the AKPC clinic in Phoenix, AZ.

14.   Defendant Arthritis Strategies of Texas, PLLC is:

    a.   a Texas professional limited liability company with a principal address of 8611

       Hillcrest Road, Dallas, TX 75225;

    b.   owned and controlled by Rush;

    c.   the AKPC clinic in Dallas, TX.

15.   Defendant Woodlands Health Group, PLLC is:

    a.   a Texas professional limited liability company with a principal address of 24624

       Interstate 45 North, Spring, TX 77386;

    b.   owned and controlled by Rush;

    c.   the AKPC clinic in Woodlands, TX.

16.   Defendant Active Life Health of Alpharetta, LLC is:

    a.   a Georgia limited liability company with a principal address of 4165 Old Milton

       Parkway, Alpharetta, GA 30005;

     b.  owned and controlled by Rush;

     c.  the AKPC clinic in Alpharetta, GA.

17.    Defendant Active Life Health of Charlotte, PLLC is:

     a.  a North Carolina professional limited liability company with a principal address of 8401 Medical Plaza Drive, Charlotte, NC 28262;

     b.  owned and controlled by Rush;

     c.  the AKPC clinic in Charlotte, NC.

18.    Defendant Active Life Health of Cincinnati, LLC is:

     a.  an Ohio limited liability company with a principal address of 8251 Pine Road, Cincinnati, OH 45236;

     b.  owned and controlled by Rush;

     c.  the AKPC clinic in Cincinnati, OH.

19.    Defendant Active Life Health of Columbia, LLC is:

     a.  a South Carolina limited liability company with a principal address of 2000 Center Point Road, Columbia, SC 29210;

     b.  owned and controlled by Rush;

     c.  the AKPC clinic in Columbia, SC.

20.    Defendant Active Life Health of Columbus, LLC is:

     a.  an Ohio limited liability company with a principal address of 6325 Emerald Parkway, Dublin, OH 43016;

     b.  owned and controlled by Rush;

     c.  the AKPC clinic in Dublin, OH.

21.    Defendant Active Life Health of Garden City Medical, PLLC is:

    a. a New York professional limited liability company with a principal address of

        623 Stewart Avenue, Garden City, NY 11530;

    b. owned and controlled by Rush;

    c. the AKPC clinic in Garden City, NY.

22.    Defendant Active Life Health of N.Y., P.C. is:

    a. a New York professional services corporation with a principal address of 300

        East Main Street, Smithtown, NY 11787;

    b. owned and controlled by Rush;

    c. the AKPC clinic in Smithtown, NY.

23.    Defendant Medical Offices of New Jersey Shore, LLC is:

    a. a New Jersey limited liability company with a principal address of 1959 Route

        34 South, Building A, Wall Township, NJ 07719;

    b. owned and controlled by Rush;

    c. the AKPC clinic in Wall, NY.

24.    Defendant AKPC, LLC is:

    a. a Texas limited liability company with a principal address of 24624 Interstate

        45 North, Spring, TX, 77386;

    b. owned and controlled by Rush;

    c. the management services organization for all AKPC clinics.

## JURISDICTION AND VENUE

25.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1345. In addition, the FCA confers jurisdiction upon the United States District Court "in which the defendant or, in the case of multiple defendants, any one defendant can be found,

resides, transacts business, or in which any act proscribed by section 3729 occurred." 31 U.S.C.

§ 3732(a). During the Relevant Period, Rush and Defendant Physicians' Health Group of

Louisville, LLC transacted business in, and did acts proscribed by the FCA within, this judicial

district. This Court has supplemental jurisdiction to entertain the common law and equitable claims

asserted herein, pursuant to 28 U.S.C. § 1367(a).

26.    Venue is proper in the Western District of Kentucky pursuant to 31 U.S.C.

§ 3732(a) and 28 U.S.C. § 1391(b), as acts complained of herein occurred within this judicial

district and division.

### THE FALSE CLAIMS ACT

27.    The FCA provides, in part, that any person who knowingly submits, or causes to be

submitted, a false claim for payment or approval; or knowingly makes, uses, or causes to be made

or used a false record or statement material to a false or fraudulent claim; or knowingly makes,

uses, or causes to be made or used, a false record or statement material to an obligation to pay or

transmit money or property to the Government, or knowingly conceals or knowingly and

improperly avoids or decreases an obligation to pay or transmit money or property to the

Government is liable to the United States for penalties and treble damages. 31 U.S.C.

§ 3729(a)(1)(A), (B), (G).

28.    "Knowing" and "Knowingly" mean that the person: (1) has actual knowledge of

the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3)

acts in reckless disregard of the truth or falsity of the information. The person need not have acted

with specific intent to defraud the United States to be liable under the FCA. 31 U.S.C. § 3729(b)(1).

As used in this Complaint, the terms "knowing" and "knowingly" have the meaning ascribed to

them by the FCA.

29.     A "claim" under the FCA includes any request or demand, whether under a contract or otherwise, for money or property that is presented to an officer, employee, or agent of the United States." 31 U.S.C. § 3729(b)(2)(A).

30.     "Obligation" means an established duty, whether or not fixed, arising from an express or implied contractual relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment. 31 U.S.C.§ 3729(b)(3). Under federal law:

> An overpayment must be reported and returned . . . by the later of
> (A) the date which is 60 days after the date on which the overpayment was identified; or
> (B) the date any corresponding cost report is due, if applicable.

42 U.S.C. § 1320a-7k(d)(2).

31.     The term "material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money. 31 U.S.C. § 3729(b)(4).

## THE MEDICARE PROGRAM

32.     In 1965, Congress enacted Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.*, known as the Medicare program.

33.     Medicare is a federal health insurance program that provides coverage for individuals based on age, disability, or affliction with end-stage renal disease. 42 U.S.C. §§ 426, 426-1.

34.     Medicare is funded by premium payments by enrollees together with contributions from funds appropriated by the Federal Government.

35.     Medicare consists of four distinct parts: A, B, C, and D. 42 U.S.C. §§ 1395c-1395i.

36.     Defendants submitted claims under Medicare Part B, which covers certain medical services rendered by physicians and other suppliers and providers.[1] 42 U.S.C. § 1395k(a)(2)(B).

37.     CMS administers the Medicare program.

38.     CMS contracts with private contractors, referred to as Medicare Administrative Contractors (MACs), to act as agents in reviewing and paying claims submitted by healthcare providers. 42 U.S.C. §§ 1395u, 1395kk-1; 42 C.F.R. Part 421.

39.     MACs generally act on behalf of CMS within a specified jurisdiction to process and pay Medicare claims submitted by a health care provider.

40.     At all times relevant to this Complaint, CGS Administrators, LLC (CGS), Noridian Healthcare Solutions, LLC (Noridian), National Government Services, Inc. (NGS), Novitas Solutions, Inc. (Novitas), and Palmetto GBA, LLC (Palmetto) were the MACs for the services billed to Medicare by Defendants.

41.     To participate in the Medicare program as a new enrollee, providers must submit a Medicare Enrollment Application, CMS Form-855B. Enrolled providers must complete a new Form CMS-855B to change their enrollment information or to reactivate, revalidate, and/or terminate Medicare enrollment.

42.     Medicare requires providers and suppliers to certify that they meet, and will continue to meet, the requirements of the Medicare laws, regulations, and program instructions. 42 C.F.R. § 424.516(a)(1).

43.     Section 1862 of the Social Security Act, codified at 42 U.S.C. § 1395y(a)(1)(A), provides that under Medicare, "no payment may be made under part A or part B for any expenses

---

[1] In the relevant regulations, physicians and other practitioners are generally referred to as "suppliers" in the Medicare program, rather than "providers." *See* 42 C.F.R. § 400.202. This Complaint nonetheless uses the common term "provider" to refer to individual practitioners.

incurred for items or services . . . [that] are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." When a provider submits a claim for payment to Medicare, the provider certifies that the services both were provided as billed and are medically reasonable and necessary.

44.     To determine whether services are reasonable and necessary such that reimbursement is appropriate, Medicare requires complete documentation of services rendered to beneficiaries. *See* 42 U.S.C. §§ 1395l(e), 1395u(c)(2)(B)(i).

45.     The Secretary of HHS (Secretary) is responsible for specifying services covered under the "reasonable and necessary" standard and has wide discretion in selecting the means for doing so. *See* 42 U.S.C. § 1395ff(a). The Secretary fulfills this responsibility both through formal rulemaking and through other forms of guidance.

46.     HHS provides guidance to eligible providers pursuant to a series of Manuals, published by CMS, which are available to the public, including on the Internet. *See generally*, CMS Manuals, available at https://www.cms.gov/medicare/regulations-guidance/manuals (last visited March 27, 2025) (hereinafter "CMS Manuals").

47.     A provider's authorized official must sign the "Certification Statement" in Section 15 of Form CMS-855B, which "legally and financially binds [the] supplier to the laws, regulations, and program instructions of the Medicare program."

48.     Rush signed certification statements in Section 15 of Form CMS-855B as the authorized official on behalf of AKPC entities. Each time, Rush agreed:

        a.  to abide by the applicable Medicare laws, regulations, and program instructions;

        b.  the Medicare laws, regulations, and program instructions are available through the Medicare contractor; and

      c.  that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with Medicare laws, regulations, and program instruction . . . and on the supplier's compliance with all applicable conditions of participation in Medicare.

49.    Rush also signed certification statements in Section 15 of Form CMS-855B in his personal capacity as a practitioner.

50.    To obtain Medicare reimbursement for administered medical services and furnished items, providers submit a claim form known as the CMS 1500 form or its electronic equivalent known as the 837P format.

51.    To submit electronic claims via the 837P format, a provider must complete and submit to CMS an Electronic Data Interchange Enrollment Form (EDI). The EDI may be completed by the provider or an authorized individual who has the legal authority "to commit the provider to abide by the laws, regulations, and the program instructions of Medicare."

52.    On the EDI, the provider agrees to "submit claims that are accurate, complete, and truthful" and certifies that the use of the provider's NPI on a claim "constitutes the provider's legal electronic signature and an assurance that services were performed as billed." The provider's EDI certification then serves as the signature for every electronic claim submitted by the provider thereafter.

53.    AKPC entities submitted EDIs signed by Rush to CMS.

54.    Among the information the provider includes on a CMS 1500 or the 837P electronic claim are Current Procedural Terminology Codes (CPT codes), CMS Healthcare Common Procedure Coding System (HCPCS) codes, and/or modifiers to such codes. These codes are the

providers' express identification of the services rendered and certification that such services are reimbursable.

55.    Medicare requires proper and complete documentation of the services rendered to beneficiaries:

> No payment shall be made to any provider of services or other person under this part unless there has been furnished such information as may be necessary in order to determine the amounts due such provider or other person under this part for the period with respect to which the amounts are being paid or for any prior period.

42 U.S.C. § 1395l(e).

56.    Providing accurate CPT and HCPCS codes in claims is material to and a condition of payment. *See, e.g.*, Medicare Learning Network Fact Sheet, Medicare Billing: 837P and Form CMS-1500.

57.    Medicare regulations further explain, because "[t]he physician has a major role in determining utilization of health services furnished by providers," such as deciding on treatments and ordering tests, "sections 1814(a)(2) and 1835(a)(2) of the [Social Security] Act establish as a condition for Medicare payment that a physician certify the necessity of the services. . . ." 42 C.F.R. § 424.10(a); *see also* 42 C.F.R. § 424.24(g)(1).

58.    For example, when submitting the CMS 1500 to Medicare, providers certify:

    a.   the claim is truthful, accurate, and complete;

    b.   the providers familiarized themselves with all applicable laws, regulations, and program instructions, which are available from the Medicare contractor;

    c.   the claim complies with all applicable Medicare laws, regulations, and program instructions for payment; and

    d.   the services on the claim form were medically necessary.

59.     The provider also must include on the CMS 1500 form or 837P format a National Provider Identifier (NPI), which is a unique 10-digit identification number corresponding to a specific healthcare provider. Claims for services must include the NPI for the "billing provider or group," "rendering provider," and "ordering/referring provider." Medicare Claims Processing Manual, Ch. 26, § 10.4.

60.     The provider certifies on the CMS-1500 or 837P that "the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision[.]"

61.     The claims submitted to Medicare, at issue in this action, identified AKPC entities as the billing provider, and various non-physician practitioners (*i.e.*, nurse practitioners or physician assistants) and physicians as the rendering provider.

62.     Because it is not feasible for Medicare personnel to review every patient's medical record for the millions of claims for payment they receive from providers, the program relies on providers to comply with program requirements and to submit truthful, accurate, and complete certifications and claims.

63.     Generally, after a provider electronically submits the claim to CGS, Noridian, NGS, Novitas, or Palmetto, the claim is paid directly to the provider without any review of supporting documents, including medical records.

64.     During the Relevant Period, Defendants billed Medicare under Part B for medical services by submitting claims for reimbursement to CGS, Noridian, NGS, Novitas, and Palmetto.

65.     Defendants received payment from Medicare as a direct result of these submissions.

13

66.    Once Medicare has processed a claim, the provider will receive a notice referred to as a remittance advice. The remittance advice explains the payments and any adjustments made during claim adjudication.

67.    A provider has a duty to familiarize itself with the statutes, regulations, and guidelines regarding coverage and reimbursement for the Medicare services it provides.

## DEFENDANTS' FALSE AND/OR FRAUDULENT CONDUCT

### I.    Rush Controls All Aspects of AKPC's Operations.

68.    During the Relevant Period, Rush has operated seventeen AKPC clinics across the United States, including in Kentucky, Arizona, Georgia, New Jersey, New York, North Carolina, Ohio, South Carolina, and Texas.

69.    Each clinic is a distinct legal entity, owned by Rush, and doing business as the Arthritis Knee Pain Centers.

70.    Rush is AKPC's Chief Executive Officer and Chief Medical Officer.

71.    AKPC's corporate headquarters, Revenue Cycle Center, and Woodlands, Texas clinic are located in the same office building.

72.    Rush dictates how AKPC treats patients, documents that treatment, and bills for it.

### i.    *Rush Controls How AKPC Treats Its Patients.*

73.    Rush creates AKPC's treatment policies and protocols.

74.    AKPC's treatment policies and protocols dictate how AKPC medical providers treat their patients' knee osteoarthritis.

75.    Each AKPC clinic has implemented Rush's treatment policies and protocols.

76.    Rush requires AKPC medical providers to follow his policies and protocols.

77.    Rush drafts and disseminates memorandums to AKPC medical providers.

78.     Through these memorandums, Rush exerts further control over how AKPC medical providers treat their patients' knee osteoarthritis.

79.     At each AKPC clinic, medical assistants (MAs) prepare the syringes containing contrast, draft the medical records, and assist the physician during knee injection procedures.

80.     At each AKPC clinic, non-physician practitioners (NPPs), such as nurse practitioners or physician assistants, evaluate patients.

81.     During an evaluation, an NPP performs a physical exam, takes and interprets an x-ray, forms a diagnosis, and creates a treatment plan.

82.     The NPP's treatment plan often includes a prescription for a viscosupplement treatment cycle.

83.     At AKPC, a viscosupplement treatment cycle generally consists of three to five viscosupplement injections per knee, depending on the proprietary brand of viscosupplement prescribed.

84.     Per the FDA labeling for viscosupplements, injections during a treatment cycle are to be provided at weekly intervals.

85.     At each AKPC clinic, physicians perform knee injection procedures.

86.     AKPC NPPs decide whether a patient is a candidate for treatment and create the treatment plan; AKPC physicians follow it.

87.     Rush has criticized physicians for questioning an NPP's treatment plan.

88.     For example, in a June 6, 2019 email to George Reimann, an AKPC physician, Rush told Reimann: "This will be your last warning. Let me be clear – I am not 'taking sides' nor questioning your medical judgment. I am telling you to call me on EACH and EVERY patient that

you deem to not be a candidate after my PA deems the patient to be a candidate. Failure to adhere

to this directive will be grounds for immediate dismissal." (formatting in original).

89.    Rush demands strict adherence to his treatment policies and protocols.

90.    For example, in his June 12, 2020 Employee Update about his Treatment Protocol

for Zilretta,[2] Rush reiterated to AKPC employees:

> [W]e do not start new patients on Zilretta. Patients should be treated with Zilretta
> ONLY after they have completed a course of viscosupplementation . . . . For
> patients whose health insurance requires step therapy, and the administration of a
> steroid prior to beginning viscosupplementation, please use Kenalog (or similar)
> prior to the course of viscosupplementation. **DO NOT USE ZILRETTA!**

(formatting in original).

91.    Rush further emphasized that **"[a]ny deviation from this treatment protocol**

**requires that the requesting physician call me directly**. Thank you in advance for strictly

adhering to this treatment policy." (formatting in original).

92.    When an AKPC clinic hires a new physician, Rush travels there to train the

physician on how to perform injections per his policies and protocols.

93.    While at the location, Rush also performs knee injections.

94.    Rush has caused billings to be submitted to Medicare for services he personally

performed at AKPC clinics, including the one in Louisville, KY.

95.    Each AKPC clinic has a practice manager.

96.    Practice managers enforce Rush's policies and protocols, at times questioning and

challenging the medical judgment of NPPs and physicians, despite not being medical providers

themselves.

97.    AKPC rewards physicians who perform high volumes of injections.

---

[2] Zilretta is an extended-release corticosteroid.

98.    AKPC bestows its Golden Thumb Award on some of these physicians.

99.    It is called the Golden Thumb Award because physicians use their thumb to exert pressure on the syringe's plunger to inject the viscosupplement or corticosteroid into the knee joint.

100.    The Golden Thumb Award is given to physicians who perform a substantial volume of knee injections, often numbering into the tens of thousands.

### ii.    Rush Controls How AKPC Providers Document Treatment.

101.    At each AKPC clinic, medical treatment is documented in an electronic medical record (EMR).

102.    These EMRs consist of a series of medical record templates.

103.    The medical record templates contain drop-down boxes with pre-populated language.

104.    All AKPC clinics use the same medical record templates contained in the EMR.

105.    Rush approved AKPC's medical record templates.

### iii.    Rush Controls How AKPC Bills For Treatment.

106.    Rush dictates how all AKPC clinics bill Medicare for their services.

107.    Rush decides which CPT codes, HCPCS codes, and modifiers will be used to bill for services provided at AKPC clinics.

108.    Rush monitors billings for each AKPC clinic through Arthritis Knee Pain Centers, LLC.

109.    Arthritis Knee Pain Centers, LLC operates AKPC's Revenue Cycle Center (RCC).

110.    AKPC's Vice President of Revenue Cycle, Tiffany McKenzie, oversees billing activities at AKPC.

111.    McKenzie had access to and reviewed remittance advice related to Defendants' claims.

112.    McKenzie reports directly to Rush.

113.    McKenzie receives "directives" from Rush about how the RCC is to bill for AKPC's services.

114.    AKPC's RCC codes and bills for the services provided at each AKPC clinic.

115.    AKPC's RCC has distributed billing guidelines and policies, referred to as "cheat sheets," for its coders to follow.

116.    Coders use the "cheat sheets" to code and bill for services provided at each AKPC clinic.

117.    After a service is provided at an AKPC clinic, coders review the medical record for that service, which was created using AKPC's templates.

118.    Using the "cheat sheets" and what is specified in the medical record, coders create the claim for that service by selecting CPT codes, HCPCS codes, and modifiers.

119.    Once coders have created the claim, it is routed to AKPC's billing company, which then submits it to Medicare.

120.    Between at least April 2019 and April 2023, CureMD was AKPC's third-party billing company.

121.    Per the terms of its contract with AKPC, CureMD was not responsible for ensuring that claims were accurate, complete, medically necessary, and appropriate. Those were AKPC's sole responsibilities.

122.    Since on or about May 1, 2023, TBC Solutions has been AKPC's billing company.

123.    Located in Pakistan, TBC Solutions is owned and controlled by Rush.

### iv.    *Rush Controls What AKPC's Chief Compliance Officers Do and Know.*

124.    Six months into the Relevant Period, Rush agreed to a False Claims Act settlement with the United States related to allegations that, between February 1, 2017 and May 30, 2017, he knowingly submitted or caused the submission of false claims for medically unnecessary viscosupplement injections and knee braces. *See* DOJ Press Release, available at https://www.justice.gov/archives/opa/pr/former-osteo-relief-institutes-and-their-owners-pay-over-71-million-resolve-allegations (last visited March 27, 2025).

125.    More specifically, Rush agreed to a False Claims Act settlement with the United States related to allegations that he and his co-defendants:

    a.    provided fluoroscopic-guided viscosupplementation injections that were medically unnecessary because they were provided to patients who did not need any injections, who received treatment in both knees even though treatment was indicated for only one knee, and who had just completed an earlier series of injections and thus did not need additional treatment for several months, if at all;

    b.    knowingly purchased and provided to patients hyaluronic acid distributed in foreign markets and reimported to the United States. The reimported hyaluronic acid had not received final marketing approval by the Food and Drug Administration (FDA) and contained packaging and labeling different than what the FDA approved for domestic versions; and

    c.    provided expensive custom-fitted, prefabricated and custom-fabricated knee braces that were medically unnecessary, where a standard, less expensive brace, or no brace at all, was indicated.

126.    In connection with the False Claims Act settlement, Rush agreed to a five-year Corporate Integrity Agreement (CIA) with the Office of Inspector General (OIG) for HHS (HHS-OIG).

127.    A CIA is a document outlining obligations a healthcare provider agrees to as part of a civil settlement with HHS-OIG, to promote compliance with federal healthcare program requirements and avoid exclusion from participation.

128.    Among other conditions in the CIA, AKPC was required to have a Compliance Program and a Chief Compliance Officer.

129.    AKPC's Chief Compliance Officer was supposed to play an integral role in implementing AKPC's Compliance Program by developing and implementing plans to ensure compliance and by investigating compliance issues, including those related to AKPC's Medicare billings.

130.    On information and belief, by Rush's design and under his control, AKPC did not implement a legitimate compliance program.

131.    Rush selected AKPC's Chief Compliance Officers.

132.    Dr. Robert Boyer was AKPC's Chief Compliance Officer from September 2019 to November 2020.

133.    Boyer described himself as AKPC's Chief Compliance Officer "on paper."

134.    In Boyer's opinion as a former AKPC Chief Compliance Officer who worked for Rush for years, "[Rush] is focused on the Benjamins, like a lot of people who sell their soul for the dollar."

135.    Dr. Muftah Ahmed was AKPC's Chief Compliance Officer from November 2020 to January 2022.

136.   In describing his work as AKPC's Chief Compliance Officer, Ahmed stated:

Dr. Rush would only tell me what he wanted me to know. I felt like I was an outsider, was being left out of the bigger conversations, and was the Compliance Officer in name only. The more I climbed the corporate ladder at AKPC, the more in the dark I felt about what was really going there.

## II.   Defendants Knowingly Submitted or Caused to Be Submitted False Claims for Medically Unreasonable and Unnecessary Injections and Knowingly Retained Overpayments Resulting From These False Claims.

137.   Medicare only pays for medical procedures—including knee injections—that are medically reasonable and necessary.

138.   Medicare's reimbursement for knee injections varies depending on whether the procedure is performed unilaterally (on one knee) or bilaterally (on both knees).

139.   If a provider performs bilateral injections during one patient visit, the provider will receive less money in Medicare reimbursements than if the provider performs one unilateral injection during one patient visit and the counterpart unilateral injection during another. However, for these unilateral injections to be reimbursable by Medicare, it must be medically reasonable and necessary to perform them during two separate patient visits.

140.   As described below, Rush fraudulently increased AKPC's Medicare reimbursements by requiring AKPC patients with bilateral knee osteoarthritis to receive unilateral injections on separate patient visits, when it was not medically reasonable and necessary to do so.

### i.   Rush Fraudulently Increased AKPC's Medicare Reimbursements By Creating and Implementing A "Care Pattern" of Injecting One Knee Per Date of Service.

141.   During a Zoom call on January 29, 2019, Rush told AKPC executives that AKPC would increase revenue by performing injections on patients with bilateral knee osteoarthritis on separate days, instead of injecting both knees on the same day as AKPC had done for years.

21

142.    On February 2, 2019, Rush emailed AKPC's Chief Operations Officer, Anthony Scatena, and asked him to meet with the "entire staff and explain the **change in care pattern** that is **taking place in all of my clinics at my direction**." (emphasis added).

143.    In that same email, Rush further instructed Scatena to "let the staff know that I can not be in all 11 of my clinics at once and that I wanted no potential variation that could possibly come from a conference call and people misinterpreting my message."

144.    Later that day, Rush emailed CureMD and AKPC executives and wrote that "beginning Monday, 2/4/2019, **all of my clinics will only inject one (1) knee per date of service**." (emphasis added).

145.    This prohibition, however, did not apply to AKPC patients who paid cash: they were always allowed to receive same-day bilateral injections.

146.    Per Rush's "care pattern," injections provided to patients with bilateral osteoarthritis were performed unilaterally at AKPC on separate patient visits, with one counterpart injection of the bilateral pair given on one day and the other counterpart injection given on another.

147.    On February 4, 2019, CureMD informed Rush that per his "memos, we have updated (sic) system to make sure that viscosupplement injections are billed for the (sic) one side/day effective Today (sic), February 4th, 2019."

148.    Per Rush's "care pattern" and on February 4, 2019, AKPC immediately began switching AKPC patients—even *after* they had already started their bilateral viscosupplement treatment cycle—to unilateral injections.

149.    For example, on January 28, 2019, an AKPC medical provider injected both of Medicare patient, V.M.'s, knees in accordance with V.M.'s treatment plan, which dictated he would receive same-day bilateral injections once per week for five weeks.

150.    Per AKPC's medical record for that January 28, 2019 patient visit, V.M. "tolerated the procedure well and there were no signs of allergic reaction" and "was discharged in stable condition."

151.    But, on February 4, 2019 and per Rush's "care pattern," AKPC switched him from weekly same-day bilateral injections, as he had been prescribed and received on January 28, 2019, to bi-weekly unilateral injections.

152.    There was no medical reason[3] for changing V.M's treatment from weekly same-day bilateral injections to bi-weekly unilateral injections, and no reason is documented in his medical record.

153.    In addition to applying his "care pattern" to AKPC's viscosupplement injections, Rush also applied it to AKPC's other injections, including those involving Zilretta.

154.    In a May 19, 2019 email exchange, Rush was explicitly told that Medicare pays for same-day bilateral injections.

155.    During this email exchange between Rush and a Vice President from Flexion Therapeutics, the distributor of Zilretta, Rush asked: "In anticipation of getting our contract over the goal-line, **I'm beginning to write a memo for all of the physicians and mid-levels I employee in my clinics about Zilretta (as well as my coders/billers). Regarding coding & reimbursement for Zilretta, can I inject both of the patient's knees on the same date of service? Or, do I have to inject each knee on a different date of service?** As we discussed, I currently have to inject the viscosupplement on different dates of service, so even if this is the case for Zilretta, it will not be an issue for my clinics." (emphasis added).

---

[3]Administering these injections to each of V.M.'s knees at bi-weekly intervals was not in accordance with the FDA label for Hyalgan, the proprietary brand of viscosupplement used during his treatment cycle.

156.    Although Rush's May 19 email suggested that he had to inject viscosupplement on different dates of services, that was simply not true.

157.    Indeed, the Vice President responded later that day: "**For Medicare Part B there are no restrictions on two knees on the same day of service**. The coding should include the modifiers for left and/or right knee." (emphasis added).

158.    On May 20, 2019, Rush replied: "I received your additional e-mail about your field reimbursement team. Out of an abundance of caution, **I'll just have my clinics inject one knee/date of service.** My (sic) can always modify down the road." (emphasis added).

159.    On May 28, 2019, Rush sent a Memorandum to all of AKPC's physicians and NPPs.

160.    The subject of the Memorandum was "Zilretta Contract Signed."

161.    In his Memorandum, Rush told all AKPC physicians and NPPs that "[b]eginning Monday, June 3, we will begin administering Zilretta to patients on their one-month follows ups, if their pain relief is not complete."

162.    Rush further noted that "**Zilretta, just like all of the viscosupplements, can only be injected into 1 knee/date of service**." (emphasis added).

163.    AKPC applied Rush's "care pattern" to all its Medicare patients with bilateral knee osteoarthritis.

164.    Rush's "care pattern" represented a dramatic shift from how AKPC had previously treated Medicare patients with bilateral knee osteoarthritis.

165.    Previously, when injections were performed bilaterally on the same-day at AKPC, they were given during one patient visit as a pair of injections, consisting of two counterparts, a left knee injection and a right knee injection.

166.    Between June 1, 2017, and February 3, 2019, AKPC's practice was to provide same-day bilateral injections to Medicare patients with bilateral knee osteoarthritis and to provide unilateral injections to Medicare patients with unilateral knee osteoarthritis.

167.    Indeed, during this period AKPC billed Medicare (and Medicare paid) for more than 17,000 same-day bilateral injections given to more than 2,900 Medicare patients with bilateral knee osteoarthritis.

### ii.    *Rush's Justification For His "Care Pattern" Was False And He Knew It.*

168.    As a justification for his "care pattern," Rush blamed Medicare "code changes" and purported Medicare denials of a specific CPT code when that code was used to bill for same-day bilateral injection services.

169.    The justification for his "care pattern" was false.

170.    Both before and after Rush provided this justification, Medicare paid for same-day bilateral injections.

171.    Both before and after Rush provided this justification, he was aware that Medicare paid for same-day bilateral injections.

172.    In reality, Rush decided that AKPC would only perform unilateral injections—not because Medicare did not pay for same-day bilateral injections or because it was medically reasonable and necessary to do so—but because he and AKPC would make more money if injections were performed on separate dates of service.

173.    Rush falsely represented to AKPC's physicians and NPPs that Medicare would not pay for same-day bilateral injections.

174.    Rush's "care pattern" resulted in Medicare patients at AKPC no longer being scheduled to receive same-day bilateral injections

175.    Before any exception could be made to his "care pattern," Rush required practice managers to call him to request his permission to allow a Medicare patient to receive same-day bilateral injections.

176.    When Medicare patients with bilateral knee osteoarthritis asked why they could not receive same-day bilateral injections, AKPC practice managers and employees told them that Medicare did not pay for them, which was not true.

177.    Because receiving unilateral injections on separate days inconvenienced them and prolonged their pain, Medicare patients often pleaded with AKPC practice managers and employees to allow them to receive same-day bilateral injections.

178.    Patients who persistently complained—often after they had called Medicare and Medicare had confirmed that it paid for same-day bilateral injections—would sometimes convince practice managers to contact Rush to ask him to make an exception to his "care pattern."

179.    Rush occasionally granted exceptions to his "care pattern."

180.    When he did, AKPC billed Medicare (and Medicare paid) for these same-day bilateral injections.

181.    For example, a medical provider at Arizona Health Services, PLLC provided same-day bilateral injections to Medicare patient, J.K., on 8/12/20, 8/19/20, 8/26/20, 9/2/20, and 9/9/20.

182.    AKPC billed Medicare (and Medicare paid) for all of these same-day bilateral injections.

183.    Indeed, while his "care pattern" was in effect, Rush personally provided same-day bilateral injections to patients, and AKPC billed Medicare (and Medicare paid) for them.

184.    For example, Rush personally provided same-day bilateral injections to Medicare patient, J.M., on 4/26/21 at the AKPC clinic in Columbia, SC. Another AKPC physician provided same-day bilateral injections to J.M. at that location on 4/12/21, 4/19/21, 5/3/21, and 5/10/21.

185.    AKPC billed Medicare (and Medicare paid) for all five same-day bilateral injection procedures. AKPC received remittance advice notifying it that was paid for these same-day bilateral injections.

186.    By the end of 2021, if not earlier, AKPC's Vice President of Revenue Cycle, Tiffany McKenzie, told Rush that Medicare was reimbursing AKPC for same-day bilateral injections.

187.    McKenzie recognized that there was no reason for Rush's policy because Medicare was paying AKPC the entire time for same-day bilateral injections.

188.    After McKenzie told Rush that Medicare was paying AKPC for same-day bilateral injections, Rush reinforced his policy requiring patients to get unilateral injections and continued requiring Medicare patients with bilateral knee osteoarthritis to receive unilateral injections on separate days.

### iii.    Rush's "Care Pattern" Inconvenienced Patients and Delayed Their Pain Relief.

189.    Rush's "care pattern" resulted in AKPC patients receiving treatment over ten patient visits, instead of five, and spending more time in AKPC waiting rooms than they would if they had received same-day bilateral injections.

190.    Caregivers or family members often transported AKPC patients to their appointments and waited with them.

191.    During the COVID-19 pandemic, Rush's "care pattern" also resulted in AKPC patients risking additional exposure to themselves and their caregivers or family members as they attended these additional visits and spent more time in AKPC waiting rooms.

192.   For many AKPC patients, Rush's "care pattern" also extended the length of the viscosupplement treatment course, often by more than 30 days, and resulted in them suffering in pain longer than they would have if they had received same-day bilateral injections.

### iv.   Rush's "Care Pattern" Resulted in Defendants Knowingly Submitting or Causing the Submission of False Claims to Medicare for Medically Unreasonable and Unnecessary Injections.

193.   Defendants Rush, AKPC, LLC, and the AKPC entities identified in Exhibit A knowingly submitted or caused the submission of false claims to Medicare for medically unreasonable and unnecessary injections.

194.   Each of the representative claims identified in Exhibit A were false because it was medically unreasonable and unnecessary to perform those injections on separate dates than their counterparts.

195.   Each certification in support of the representative claims identified in Exhibit A was false because it was medically unreasonable and unnecessary to perform those injections on separate dates than their counterparts.

196.   Rush personally provided medically unreasonable and unnecessary injections to AKPC patients.

197.   AKPC routinely did not document in a patient's medical record any purported medical rationale for why it was medically reasonable and necessary for that particular patient to receive their counterpart injections on separate dates.

198.   Defendants Rush, AKPC, LLC, and the AKPC entities identified in Exhibit A acted knowingly by submitting and causing others to submit claims to Medicare for tens of thousands of medically unreasonable and unnecessary injection claims after uniformly applying Rush's "care pattern" to thousands of Medicare patients—regardless of their particular medical needs—and when doing so inconvenienced them and delayed their treatment and, in some instances, violated

28

the FDA labeling for viscosupplements by treating those patients with bi-weekly, instead of weekly, knee injections.

*Examples of Medically Unreasonable and Unnecessary Viscosupplement Injections*

199.    AKPC could have provided medically reasonable and necessary same-day bilateral viscosupplement injections to thousands of Medicare patients, including those listed in the table below, over the course of five patient visits.

200.    Instead, by requiring them to receive unilateral injections on separate days, AKPC doubled the number of their patient visits.

201.    By requiring thousands of Medicare patients to attend extra patient visits and risk additional exposure to COVID in order to receive treatment, Rush and AKPC increased their reimbursements from Medicare, as illustrated in the representative examples below:

| Patient (Age) | AKPC Clinic | Injections Right Knee | Injections Left Knee | Extra Patient Visits | Extra Medicare $ for Rush and AKPC[4] |
|---|---|---|---|---|---|
| B.S. (90) | Charlotte, NC | 10/28/21, 11/4/21, 11/11/21, 11/18/21, 12/2/21 | 10/29/21, 11/5/21, 11/12/21, 11/19/21, 12/3/21 | 5 | $739.45 |
| S.B. (76) | Columbus, OH | 10/13/20, 10/21/20, 10/29/20, 11/5/20, 11/11/20 | 10/14/20, 10/20/20, 10/28/20, 11/4/20, 11/12/20 | 5 | $707.51 |
| B.B. (83) | Wall Township, NJ | 4/30/21, 5/6/21, 5/13/21, 5/27/21 6/7/21 | 5/3/21, 5/10/21, 5/18/21, 6/1/21, 6/8/21 | 5 | $844.10 |

---

[4] Despite providing the same type of procedure to these Medicare beneficiaries, AKPC received varying reimbursement amounts from Medicare because, among other things, reimbursement rates vary by year and MAC jurisdiction.

pesantren

Example Patient: B.S.

202.     During her medical evaluation at AKPC, B.S., age 90, ranked the intensity of her left and right knee pain as 9 out of 10. B.S. walked with two canes, one in each hand, and sometimes used a walker for longer distances. Bending, physical activity, standing, and walking increased her knee pain. B.S. had decreased mobility as a result of her pain and increased instability in knees.

203.     AKPC did not document in B.S.'s medical records any medical rationale to explain why it was medically reasonable and necessary for B.S. to receive her counterpart injections on separate dates.

204.     Active Life Health of Charlotte, PLLC provided medically unreasonable and unnecessary unilateral injections to B.S. on 10/28/21, 10/29/21, 11/4/21, 11/5/21, 11/11/21, 11/12/21, 11/18/21, 11/19/21, 12/2/21, and 12/3/21.

205.     Medicare paid Active Life Health of Charlotte, PLLC $5,112 for these medically unreasonable and unnecessary unilateral injections.

206.     Although it was medically unreasonable and unnecessary to provide these injections unilaterally on separate days, it would have been medically reasonable and necessary to provide them bilaterally on the same day.

207.     If, instead, Active Life Health of Charlotte, PLLC had provided medically reasonable and necessary same-day bilateral injections to B.S., Medicare would have paid $4,372.55, and B.S. would have attended five less patient visits.

208.     Had Medicare known that the claims Rush, AKPC, LLC, and Active Life Health of Charlotte, PLLC submitted or caused to be submitted for unilateral injections provided to B.S.

were false because they were medically unreasonable and unnecessary, Medicare would not have paid the additional $739.45.

Example Patient: S.B.

209.    During her medical evaluation at AKPC, S.B., age 76, ranked the intensity of her left and right knee pain as 7 out of 10. She described her knee pain as sharp, sore, stabbing, and constant. S.B. limped as she walked and reported that bending, driving, kneeling, and getting in/out of the vehicle increased her knee pain. She also reported that her knees give out on her and that she used opiates to manage her pain.

210.    AKPC did not document in S.B.'s medical records any medical rationale for why it was medically reasonable and necessary for S.B. to receive her counterpart injections on separate dates.

211.    Active Life Health of Columbus, LLC provided medically unreasonable and unnecessary unilateral injections to S.B. on 10/13/20, 10/14/20, 10/20/20, 10/21/20, 10/28/20, 10/29/20, 11/4/20, 11/5/20, 11/11/20, and 11/12/20.

212.    Medicare paid Active Life Health of Columbus, LLC $5,599.89 for these medically unreasonable and unnecessary unilateral injections.

213.    Although it was medically unreasonable and unnecessary to provide these injections unilaterally on separate days, it would have been medically reasonable and necessary to provide them bilaterally on the same day.

214.    If, instead, Active Life Health of Columbus, LLC had provided medically reasonable and necessary same-day bilateral injections to S.B., Medicare would have paid $4,892.38 and S.B. would have attended five less patient visits.

215.    Had Medicare known that the claims Rush, AKPC, LLC, and Active Life Health of Columbus, LLC submitted or caused to be submitted for unilateral injections provided to S.B. were medically unreasonable and unnecessary, Medicare would not have paid the additional $707.51.

Example Patient: B.B.

216.    During her medical evaluation at AKPC, B.B., age 83, ranked her left knee pain as 6 out of 10 and her right knee pain as 8 out of 10. B.B. reported that it was very difficult for her to get out of her car due to extreme knee stiffness. B.B. reported that her knee pain was not alleviated by the use of pain medication.

217.    AKPC did not document in B.B.'s medical records any medical rationale for why it was medically reasonable and necessary for B.B. to receive her counterpart injections on separate dates.

218.    Medical Offices of New Jersey Shore, LLC provided medically unreasonable and unnecessary unilateral injections to B.B. on 4/30/21, 5/3/21, 5/6/21, 5/10/21, 5/13/21, 5/18/21, 5/27/21, 6/1/21, 6/7/21, and 6/8/21.

219.    Medicare paid Medical Offices of New Jersey Shore, LLC $2,584.90 for these medically unreasonable and unnecessary unilateral injections.

220.    Although it was medically unreasonable and unnecessary to provide these injections unilaterally on separate days, it would have been medically reasonable and necessary to provide them bilaterally on the same day.

221.    If, instead, Medical Offices of New Jersey Shore, LLC had provided medically reasonable and necessary same-day bilateral injections to B.B., Medicare would have paid $1,740.80, and B.B. would have attended five less patient visits.

222.    Had Medicare known that the claims Rush, AKPC, LLC, and Active Life Health of Columbus, LLC submitted or caused to be submitted for unilateral injections provided to B.B. were medically unreasonable and unnecessary, Medicare would not have paid the additional $844.10.

223.    In addition to doubling the number of patient visits, AKPC substantially increased the length of treatment for thousands of Medicare patients, delaying their pain relief.

224.    AKPC could have provided medically reasonable and necessary same-day bilateral injections to thousands of Medicare patients, including those listed below, over the course of five weeks.

225.    Instead, by lengthening the treatment times for thousands of Medicare patients, Rush and AKPC increased their Medicare reimbursements, as illustrated in the representative examples below:

| Patient (Age) | AKPC Clinic | Injections Right Knee | Injections Left Knee | Extra Days to Complete Treatment | Extra Medicare $ for Rush and AKPC[5] |
|---|---|---|---|---|---|
| V.M.[6] (78) | Smithtown, NY | 2/4/19, 2/18/19, 3/4/19, 3/18/19 | 2/11/19, 2/27/19, 3/11/19, 3/25/19 | 26 days | $701.28 |
| L.S. (84) | Phoenix, AZ | 11/17/20 11/24/20, 12/1/20, 12/8/20, 12/15/20 | 12/22/20, 12/29/20, 1/5/21, 1/12/21, 1/19/21 | 35 days | $711.50 |

---

[5] Despite providing the same type of procedure to these Medicare beneficiaries, AKPC received varying reimbursement amounts from Medicare because, among other things, reimbursement rates vary by year and MAC jurisdiction.

[6] As discussed above, V.M. received injections in both knees on January 28, 2019, and then, on the same day Rush's "care pattern" became effective, was switched to bi-weekly unilateral injections.

| P.C. (82) | Lexington, KY | 2/25/22, 3/4/22, 3/11/22, 3/16/22, 3/21/22 | 4/1/22, 4/4/22, 4/14/22, 4/21/22, 4/28/22 | 38 days | $712.25 |
|---|---|---|---|---|---|

Example Patient: V.M.

226.   During his medical evaluation at AKPC, V.M., age 78, ranked his left and right knee pain as 6 out of 10. He described his pain as aching and sore. V.M. reported that sitting, using stairs, and walking increased his knee pain. V.M. took pain medication, as needed, for his knee pain.

227.   AKPC did not document in V.M's medical records any medical rationale for why it was medically reasonable and necessary for V.M's to receive his counterpart injections on separate dates. To the contrary, an AKPC medical provider determined that V.M. should receive medically reasonable and necessary same-day bilateral injections and documented that the "prognosis is good for bilateral knee viscosupplementation injection series as per the treatment plan . . . ."

228.   Nonetheless, Active Life Health of N.Y., P.C. provided medically unreasonable and unnecessary unilateral injections to V.M. on 2/4/19, 2/11/19, 2/18/19, 2/27/19, 3/4/19, 3/11/19, 3/18/19, and 3/25/19.

229.   Medicare paid Active Life Health of N.Y., P.C. $2,452.20 for these medically unreasonable and unnecessary unilateral injections.

230.   Although it was medically unreasonable and unnecessary to provide these injections unilaterally on separate days, it would have been medically reasonable and necessary to provide them bilaterally on the same day.

231.   If, instead, Active Life Health of N.Y., P.C. had provided medically reasonable and necessary same-day bilateral injections to V.M. Medicare would have paid $1,750.92, and he would have finished his treatment cycle 26 days earlier than he did.

232.   Had Medicare known that the claims Rush, AKPC, LLC, and Active Life Health of N.Y., P.C. submitted or caused to be submitted for unilateral injections provided to V.M. were medically unreasonable and unnecessary, Medicare would not have paid the additional $701.28.

Example Patient: L.S.

233.   During her medical evaluation at AKPC, L.S., age 84, ranked her left knee pain as 3 out 10 and her right knee pain as 4 out 10. She described her pain as aching and stabbing. L.S. reported that bending, driving, getting in/out of her vehicle, sitting, standing, and walking increased her knee pain. L.S. took pain medication for her knee pain.

234.   AKPC did not document in L.S's medical records any medical rationale for why it was medically reasonable and necessary for L.S. to receive her counterpart injections on separate dates.

235.   Arizona Health Services, PLLC provided medically unreasonable and unnecessary unilateral injections to L.S. on 11/17/20, 11/24/20, 12/1/20, 12/8/20, 12/15/20, 12/22/20, 12/29/20, 1/5/21, 1/12/21, and 1/19/21.

236.   Medicare paid Arizona Health Services, PLLC $5,710.69 for these medically unreasonable and unnecessary unilateral injections.

237.   Although it was medically unreasonable and unnecessary to provide these injections unilaterally on separate days, it would have been medically reasonable and necessary to provide them bilaterally on the same day.

238.    If, instead, Arizona Health Services, PLLC had provided medically reasonable and necessary same-day bilateral injections to L.S., Medicare would have paid $4,999.19, and L.S. would have finished her treatment cycle 35 days earlier than she did.

239.    Had Medicare known that the claims Rush, AKPC, LLC, Arizona Health Services, PLLC submitted or caused to be submitted for unilateral injections provided to L.S. were medically unreasonable and unnecessary, Medicare would not have paid the additional $711.50.

Example Patient: P.C.

240.    During her medical evaluation at AKPC, P.C., age 82, ranked her left and right knee pain as 10 out of 10. P.C. reported that bending, getting in/out of her vehicle, and physical activity increased her knee pain. P.C. took pain medication for her knee pain.

241.    AKPC did not document in P.C.'s medical records any medical rationale for why it was medically reasonable and necessary for P.C. to receive her counterpart injections on separate dates.

242.    Physicians Health Group of Kentucky, PLLC provided medically unreasonable and unnecessary unilateral injections to P.C., on 2/25/22, 3/4/22, 3/11/22, 3/16/22, 3/21/22, 4/1/22, 4/4/22, 4/14/22, 4/21/22, and 4/28/22.

243.    Medicare paid Physicians Health Group of Kentucky, PLLC $5,044.59 for these medically unreasonable and unnecessary unilateral injections.

244.    Although it was medically unreasonable and unnecessary to provide these injections unilaterally on separate days, it would have been medically reasonable and necessary to provide them bilaterally on the same day.

245.    If, instead, Physicians Health Group of Kentucky, PLLC had provided medically reasonable and necessary same-day bilateral injections to P.C., Medicare would have paid $4,332.34, and P.C. would have finished her treatment cycle 38 days earlier than she did.

246.    Had Medicare known that the claims Rush, AKPC, LLC, Physicians Health Group of Kentucky, PLLC submitted or caused to be submitted for unilateral injections provided to P.C. were medically unreasonable and unnecessary, Medicare would not have paid the additional $712.25.

*Examples of Medically Unreasonable and Unnecessary Zilretta Injections*

247.    AKPC could have provided medically reasonable and necessary same-day bilateral Zilretta injections to the patients listed in the table below during one patient visit.

248.    By requiring AKPC patients to attend extra patient visits and risk additional exposure to COVID in order to receive treatment, Rush and AKPC increased their reimbursements from Medicare, as illustrated by the representative examples in the table below:

| Patient (Age) | AKPC Clinic | Injection Right Knee | Injection Left Knee | Extra Patient Visits | Extra Medicare $ for Rush and AKPC[7] |
|---|---|---|---|---|---|
| W.B. (70) | Lexington, KY | 1/4/21 | 1/7/21 | 1 | $184.18 |
| M.M (72) | Columbus, OH | 5/24/22 | 5/25/22 | 1 | $146.41 |

---

[7] Despite providing the same type of procedure to these Medicare beneficiaries, AKPC received varying reimbursement amounts from Medicare because, among other things, reimbursement rates vary by year and MAC jurisdiction.

| R.E. (89) | Louisville, KY | 8/12/20 | 8/13/20 | 1 | $143.13 |
|---|---|---|---|---|---|
|  |  |  |  |  |  |

Example Patient: W.B.

249.    During his medical evaluation at AKPC, W.B., age 70, ranked his left and right knee pain as 5 out of 10. W.B. described his knee pain as aching and sharp. W.B. reported that bending, kneeling, physical activity, and using stairs increased his knee pain.

250.    AKPC did not document in W.B.'s medical records any medical rationale for why it was medically reasonable and necessary for W.B. to receive his counterpart injections on separate dates.

251.    Physicians Health Group of Kentucky, PLLC provided medically unreasonable and unnecessary unilateral injections to W.B. on 1/4/21 and 1/7/21.

252.    Medicare paid Physicians Health Group of Kentucky, PLLC $1,256.08 for these medically unreasonable and unnecessary unilateral injections.

253.    Although it was medically unreasonable and unnecessary to provide these injections unilaterally on separate days, it would have been medically reasonable and necessary to provide them bilaterally on the same day.

254.    If, instead, Physicians Health Group of Kentucky, PLLC had provided medically reasonable and necessary same-day bilateral injections to L.S., Medicare would have paid $1,071.90.

255.    Had Medicare known that the claims Rush, AKPC, LLC, Physicians Health Group of Kentucky, PLLC submitted or caused to be submitted for unilateral injections provided to W.B. were medically unreasonable and unnecessary, Medicare would not have paid the additional $184.18.

Example Patient: M.M.

256.    During his medical evaluation at AKPC, M.M. age 72, ranked his left and right knee pain as 7 out of 10. Bending, driving, getting in/out of his vehicle, standing, and walking increased his knee pain.

257.    AKPC did not document in M.M.'s medical records any medical rationale for why it was medically reasonable and necessary for M.M. to receive his counterpart injections on separate dates.

258.    Active Life Health of Columbus, LLC provided medically unreasonable and unnecessary unilateral injections to W.B. on 5/24/22 and 5/25/22.

259.    Medicare paid Active Life Health of Columbus, LLC $1,230.54 for these medically unreasonable and unnecessary unilateral injections.

260.    Although it was medically unreasonable and unnecessary to provide these injections unilaterally on separate days, it would have been medically reasonable and necessary to provide them bilaterally on the same day.

261.    If, instead, Active Life Health of Columbus, LLC had provided medically reasonable and necessary same-day bilateral injections to M.M. Medicare would have paid $1,084.13.

262.    Had Medicare known that the claims Rush, AKPC, LLC, Active Life Health of Columbus, LLC submitted or caused to be submitted for unilateral injections provided to W.B. were medically unreasonable and unnecessary, Medicare would not have paid the additional $146.41.

Example Patient: R.E.

263.    During his medical evaluation at AKPC, R.E, age 89, ranked his left and right knee pain as 10 out of 10. R.E. described his knee pain as persistent. R.E. used a cane to walk.

264.    AKPC did not document in R.E's medical records any medical rationale for why it was medically reasonable and necessary for R.E. to receive his counterpart injections on separate dates.

265.    Physicians' Health Group of Louisville, LLC provided medically unreasonable and unnecessary unilateral injections to R.E. on 8/12/20 and 8/13/20.

266.    Medicare paid Physicians' Health Group of Louisville, LLC $1,333.84 for these medically unreasonable and unnecessary unilateral injections.

267.    Although it was medically unreasonable and unnecessary to provide these injections unilaterally on separate days, it would have been medically reasonable and necessary to provide them bilaterally on the same day.

268.    If, instead, Physicians' Health Group of Louisville, LLC had provided medically reasonable and necessary same-day bilateral injections to R.E., Medicare would have paid $1,190.71.

269.    Had Medicare known that the claims Rush, AKPC, LLC, Physicians' Health Group of Louisville, LLC submitted or caused to be submitted for unilateral injections provided to R.E. were medically unreasonable and unnecessary, Medicare would not have paid the additional $143.13.

     *v.*    ***Medicare Denied Claims for Defendants' Unreasonable and Unnecessary Injections.***

270.    In April 2021, CoventBridge, a CMS contractor, sent a Post-Payment Review Results and Overpayment Determination letter, addressed to Rush, to Defendant Physicians Health Group of Kentucky, PLLC, which is AKPC's Lexington, KY location.

271.    In finding that Physicians Health Group of Kentucky, PLLC billed for services that were not medically reasonable or necessary, CoventBridge informed Rush that a review of the claims history for a patient in the sample indicated that:

> [T]he provider performed an injection (HCPCS code J7320) on the patient's left knee on 1/6/2020 and performed the same procedure on the right knee the next day – 1/7/2020; the same happened on 1/20/2020 and 1/21/2020; 1/27/2020 and 1/28/2020; 2/3/2020 and 2/4/2020; and 2/10/2020 and 2/11/2020 for a total of ten dates of service for injections.

272.    CoventBridge noted that "[n]o documentation is present which indicates why injections for each knee were performed on separate dates of service."

273.    CoventBridge reminded Rush that, per the National Correct Coding Initiative (NCCI) Policy Manual, "physicians 'shall not inconvenience beneficiaries nor increase risks to beneficiaries by performing services on different dates of service to avoid medically unlikely edits or NCCI PTP edits.' **Services should not be performed in an effort to increase payment**." (emphasis added)

274.    CoventBridge advised Rush that the "[t]he rate of error identified in this small sampling of claims is significant; therefore, it is likely that you have been overpaid by Medicare on other claims or services not identified in this letter or its attachments. If so, you are *obligated* to refund the program." (emphasis in original).

275.   Finally, CoventBridge recommended that Rush "**conduct a self-assessment in order to identify any additional overpayments your practice or facility has received as a result of the actions which are the subject of this letter**" (emphasis in original).

276.   Notifying Rush that Physicians Health Group of Kentucky, PLLC was performing medically unreasonable and unnecessary injections likewise confirmed for Rush what he already knew: his "care pattern" was causing the submission of false claims for medically unreasonable and unnecessary injections at AKPC clinics.

277.   But, Rush and AKPC ignored CoventBridge's advice and continued to require Medicare patients with bilateral knee osteoarthritis to receive unilateral injections on separate days, like it did for the patients in the representative examples in the tables above.

### vi.   *Defendants Knowingly Retained Overpayments From These False Billings.*

278.   As of April 2021, Defendants Rush, AKPC, LLC, and the AKPC entities identified in Exhibit A knowingly and improperly avoided an obligation to pay or transmit money or property to the Government for treatment of bilateral knee osteoarthritis, after Medicare, through CoventBridge, notified Rush that Physicians Health Group of Kentucky, PLLC had received overpayments for medically unreasonable and unnecessary injections and advised him that he should review other claims for payment to determine if those claims also involved medically unreasonable and unnecessary injections.

279.   But, Rush, AKPC, LLC, and the AKPC entities identified in Exhibit A failed to review other claims for payment to determine if those claims also involved medically unreasonable and unnecessary injections.

*vii.*     ***Rush Rescinds His "Care Pattern," But Only For Viscosupplement Injections.***

280.     On or about April 2023, more than four years after he implemented his "care pattern," Rush sent a memorandum to AKPC employees rescinding it.

281.     As the purported justification for the change, Rush falsely told AKPC employees that Medicare changed its rules and now pays for same-day bilateral injections.

282.     That was false: Medicare had not changed its rules and previously paid for same-day bilateral injections.

283.     Since on or about April 2023, Rush's "directive" to all AKPC clinics has been to allow AKPC's patients with bilateral knee osteoarthritis to receive same-day bilateral viscosupplementation injections.

284.     But, despite Medicare purportedly changing its rule, Rush continued to require that Zilretta injections at AKPC be performed unilaterally during two separate patient visits.

**III.     Defendants Knowingly Submitted or Caused to Be Submitted False Claims for Medical Contrast and Knowingly Retained Overpayments Resulting From These False Claims.**

285.     Medical contrast comes in single-use vials and multi-use vials.

286.     A single-use vial is a vial of contrast that is meant for use on a single patient in a procedure or injection.

287.     A multi-use vial is a vial of contrast that is intended for use on multiple patients.

288.     Single-use vials are labeled as such by the manufacturer.

289.     Single-use vials typically lack an antimicrobial preservative.

290.     Single-use vials can become contaminated and serve as a source of infection when they are used on multiple patients.

291.    The Centers for Disease Control (CDC) has documented numerous infectious outbreaks resulting from healthcare personnel at medical clinics using single-use vials for multiple patients.

292.    The CDC documented such an outbreak in March 2017 at one of Rush's clinics.[8]

293.    At Rush's clinic, 41 patients were diagnosed with septic arthritis in their knees after Rush's employees used a single-use 50 ml vial of contrast on multiple patients.

294.    Septic arthritis is a painful joint infection that occurs when bacteria or other microorganisms spread to the knee.

295.    A delay in diagnosis and treatment can lead to amputation or death.

296.    Because single-use vials should only be used on a single patient, FDA labeling on single-use vials states that providers must discard any unused portion of contrast after the patient's procedure.

297.    For example, per the FDA labeling for Omnipaque, a brand of contrast used by AKPC, "each bottle of OMNIPAQUE injection and oral solution is intended for one procedure only. Discard any unused portion." (formatting in original).

298.    Defendants falsely billed for contrast from single-use vials.

299.    Defendants billed Medicare for contrast from single-use vials using HCPCS codes Q9965, Q9966, and Q9967, which have the following definitions:

- HCPCS code Q9965, "low osmolar contrast material, 100-199 mg/ml iodine concentration, per ml;"

- HCPCS Code Q9966, "low osmolar contrast material, 200-299 mg/ml iodine concentration, per ml;" and

---

[8] *See* CDC Home, Centers for Disease Control and Prevention, Morbidity and Mortality Weekly Report, Outbreak of Septic Arthritis Associated with Intra-Articular Injections at an Outpatient Practice — New Jersey, 2017 (https://www.cdc.gov/mmwr/volumes/66/wr/mm6629a3.htm) (last visited March 21, 2025).

- HCPCS Code Q9967, "low osmolar contrast material, 300-399 mg/ml iodine concentration, per ml."

300.    To receive compensation from Medicare for medical contrast, Medicare providers are required to accurately state the number of billing units of contrast administered to the Medicare beneficiary on the date of service for which compensation was sought.

301.    For these contrast agents, the billing unit is per ml of the product, as specified in the long description of the HCPCS code.

302.    Providers who administer contrast from a single-use vial to a Medicare patient may bill Medicare for the dose administered as well as the amount of contrast discarded, up to the amount of contrast indicated on the vial label.

303.    Medicare pays for the amount discarded from a single-use vial when the provider actually discards it and does not use the unused portion on any other patients, regardless of whether those other patients have Medicare.

304.    When billing Medicare for the contrast that was administered, providers must specify in one claim line the number of units of contrast that were administered to a patient during the injection procedure.

305.    When billing Medicare for the contrast that was discarded, providers must use standard modifier code "JW," representing to Medicare that the drug amount was "Discarded/Not Administered to Any Patient," and specify in a second claim line the number of units of contrast that were discarded after the procedure.

306.    Providers must clearly document in the patient's medical record the dose administered, the amount discarded, and the amount originally contained in the vial.

307.    As described below, Defendants submitted or caused the submission of claims for contrast where they expressly falsely certified in the claim that they had: 1) administered 50 ml of

contrast (50 billing units) to a patient during an injection procedure when, in reality, they had administered only 2 ml (2 billing units); and 2) administered 2 ml of contrast and discarded the remainder when, in reality, they had administered 2 ml to one patient and administered the remaining unused portion from the single-use vial to other patients.

i.    ***Defendants Billed for 50 ml of Contrast Administered During Injection Procedures, When They Administered No More than 2 ml.***

308.    Defendants Rush, AKPC, LLC, and the AKPC entities identified in Exhibit B knowingly submitted or caused the submission of claims for contrast where they expressly falsely certified in the claim that they had administered 50 ml of contrast (50 billing units) to a patient during an injection procedure when, in reality, they had only administered 2 ml (2 billing units).

309.    A review of more than 1,700 AKPC medical records involving contrast claims by AKPC entities—including those identified in Exhibit B, with dates of service between June 2017 and August 2022—revealed that not once in those 1,700 instances did AKPC medical providers document in the medical record that they had administered 50 ml to the individual patient. Rather, medical providers documented in these medical records that they had, at most, administered 2 ml to the individual patient.

310.    During AKPC injection procedures, AKPC medical providers never administer more than 2 ml of contrast per knee.

311.    Defendants acted knowingly when they caused the submission of the false claims for contrast identified in Exhibit B, where their corresponding medical records did not specify that 50 ml of contrast was administered to each of these patients.

*Examples of False Billings for 50 Units of Contrast With No JW Modifier*

312.    For example, as part of Medicare patient S.M.'s injection procedure, on May 7, 2019, at AKPC's Woodlands, Texas location, an AKPC medical provider injected contrast into

46

S.M.'s knee. The medical record for this patient encounter specifies that 2 ml of contrast was drawn. The corresponding claim for this procedure expressly certified that 50 ml of contrast had been administered to S.M. during the injection procedure, even though 50 ml of contrast had not been administered to this patient. Rush, Woodlands Health Group, PLLC, and AKPC, LLC submitted or caused the submission of this false claim, which Medicare paid, including $12.62 for contrast. If Medicare had known that only 2 ml of contrast had been used, it would have paid $0.50 for those two billing units instead.

313.    For example, as part of Medicare patient R.F.'s injection procedure, on June 12, 2019, at AKPC's Manhattan, NY location, an AKPC medical provider injected contrast into R.F.'s knee. The medical record for this patient encounter specifies that 2 ml of contrast was drawn. The corresponding claim for this procedure expressly certified that 50 ml of contrast had been administered to R.F. during the injection procedure, even though 50 ml of contrast had not been administered to this patient. Rush, Active Life Health of NY, P.C., and AKPC, LLC submitted or caused the submission of this false claim, which Medicare paid, including $12.62 for contrast. If Medicare had known that only 2 ml of contrast had been used, it would have paid $0.50 for those two billing units instead.

314.    For example, as part of Medicare patient C.W.'s injection procedure, on August 22, 2019, at AKPC's Smithtown, New York location, an AKPC medical provider injected contrast into C.W.'s knee. The medical record for this procedure specifies that only 2 ml of contrast was drawn. The corresponding claim for this procedure expressly certified that 50 ml of contrast had been administered to C.W. during the injection procedure, even though 50 ml of contrast had not been administered to this patient. Rush, Active Life Health of NY, P.C., and AKPC, LLC submitted or caused the submission of a false claim for 50 billing units of contrast which Medicare paid,

including $12.35 for contrast. If Medicare had known that only 2 ml of contrast had been used, it would have paid $0.49 for those two billing units instead.

315.    Each of the claims identified in Exhibit B were false because Defendants' medical providers had not administered 50 ml of contrast to these Medicare patients.

316.    Each certification in support of the claims identified in Exhibit B was false because Defendants' medical providers had not administered 50 ml of contrast to each of these Medicare patients.

317.    Had Medicare known that Defendants did not actually administer 50 ml of contrast as billed, Medicare would not have paid for 50 units of contrast.

###### ii.    *Defendants Billed for Contrast Discarded After Injection Procedures, When They Did Not Discard the Contrast.*

318.    Defendants Rush, AKPC, LLC, and the AKPC entities identified in Exhibit C knowingly submitted or caused the submission of claims for contrast where they expressly falsely certified in the claim that 2 ml of contrast had been administered to a Medicare patient and the unused portion of the single-use vial had been "Discarded/Not Administered to Any Patient" when, in reality, the unused portion had not been discarded and had been administered to other patients.

319.    Since on or about July 2019, purchasing of contrast for all AKPC clinics has been centralized and done through AKPC's corporate headquarters.

320.    AKPC practice managers maintain records, including Inventory Checklist Order Forms and/or spreadsheets, documenting the units of contrast in stock, needed, and recently received at their AKPC clinic.

321.    Each week, practice managers send updated records to AKPC's Vice President of Finance and Procurement, Daniel Poche, and AKPC's Chief Financial Officer, Brent Callister.

322.    At AKPC's Woodlands clinic, which is located inside AKPC's corporate headquarters, where Rush is based, AKPC employees trained MAs to draw multiple syringes from a single-use vial of contrast until it was empty.

323.    Like the MAs at AKPC's corporate headquarters, MAs at other AKPC locations throughout the United States were also trained by AKPC employes to draw multiple syringes from a single-use vial of contrast until it was empty.

324.    Between July 2019 and May 2022, Defendants exclusively purchased 50 ml single-use vials of contrast.

325.    AKPC's medical record template, which was created by AKPC executives and approved by Rush, contained pre-populated language specifying that:

> 2 mL of contrast was drawn up from a 50 mL single use contrast vial; 48 mL were held in reserve in case more contrast would be needed during the arthrography procedure. However, during today's procedure no additional contrast became necessary; therefore, 48 mL were discarded as wastage.

326.    AKPC's medical record template resulted in the creation of false medical records because 48 ml was routinely not discarded at AKPC clinics but, instead, re-used on other patients.[9]

327.    AKPC's coders at the RCC reviewed these medical records and created claims based on them.

328.    Because these medical records were false, the claims the coders created based on them were also false.

---

[9] This was not the first time that Rush-owned clinics re-used contrast from a 50 ml single-use vial on other patients. Indeed, as discussed above, in 2017, a Rush-owned clinic had also re-used contrast from a 50 ml single-use vial on other patients. *See* CDC Home, Centers for Disease Control and Prevention, Morbidity and Mortality Weekly Report, Outbreak of Septic Arthritis Associated with Intra-Articular Injections at an Outpatient Practice — New Jersey, 2017 (https://www.cdc.gov/mmwr/volumes/66/wr/mm6629a3.htm) (last visited March 21, 2025).

329.    Rush, AKPC, LLC, and the AKPC entities identified in Exhibit C caused the submission of these false claims to Medicare.

330.    The result of this fraudulent practice was that Defendants routinely billed Medicare for twenty-five 50 ml single-use vials (or 1,250 units of contrast) when, in reality, they had only used one 50 ml single-use vial (or 50 units of contrasts) split between twenty-five patients.

331.    This represents a 25:1 ratio of units of contrast billed to units of contrast administered.

332.    AKPC billed Medicare up to twenty-five times for the same vial of contrast.

333.    Defendants billed for much more contrast than they actually used.

334.    By treating up to twenty-five patients with the contents from one 50 ml single-use vial—but billing as though they had used up to twenty-five 50 ml single-use vials—Defendants were able to purchase much less contrast to meet their needs.

335.    Indeed, an inventory reconciliation comparing Defendants' contrast purchasing records to their Medicare billings for contrast revealed that Defendants billed Medicare for at least 2,984,195 ml of contrast or 59,683 single-use 50 ml vials more than it purchased.

336.    Consistent with their false billing practices, AKPC entities identified in Exhibit C are outliers for paid claims for discarded contrast.

337.    During the Relevant Period, Medicare paid 1,194 entities, including the 14 AKPC entities identified in Exhibit C, for claims for discarded contrast.

338.    Out of those 1,194 entities, the following AKPC entities identified in Exhibit C rank in the top 10 nationwide for paid claims for discarded contrast: Physicians' Health Group of Louisville, LLC (No. 1); Medical Offices of New Jersey Shore, LLC (No. 2); Arthritis Strategies of Texas, PLLC (No. 3); Physicians Health Group of Kentucky, PLLC (No. 4); Arizona Health

Services, PLLC (No. 5); Active Life Health of N.Y., PC (No. 6); Woodlands Health Group, PLLC (No. 7); Active Life Health of Cincinnati, LLC (No. 8); Active Life Health of Columbia, LLC (No. 9); and Active Life Health of Columbus, LLC (No. 10).

339.    During the Relevant Period, Medicare's payments to the AKPC entities identified in Exhibit C for discarded contrast comprise 67.5% of all of Medicare's payments for discarded contrast, as illustrated in the pie chart below:



■ 14 AKPC Entities   ■ 1,180 Other Entities

340.    Defendants were aware of how much contrast they were purchasing (via their invoice records), how much contrast was actually being used at each AKPC (via weekly updates from practice managers), and how much they were reimbursed for their contrast billings (via remittance notices).

341.    As a result, Defendants acted knowingly by submitting claims for millions of ml (and tens of thousands of single-use vials) of contrast more than they actually used.

342.   Defendants acted knowingly by training their employees to re-use 48 ml of contrast while, at the same time, using a medical record that specified for every injection procedure that 48 ml had been discarded from a 50 ml single-use vial.

343.   Defendants acted knowingly by providing their coders with "cheat sheets," which resulted in the coders creating claims using the JW modifier and billing Medicare for the full 50 ml single-use vial (2 used, 48 discarded), even though the unused portion had not been discarded; it was reused on other patients.

344.   Defendants acted knowingly by submitting and causing the submission of claims for contrast when multiple AKPC executives identified problems with how they were using, documenting, and billing for it.

345.   Doug Simper, an AKPC Regional Director, worked at AKPC between February 2019 and December 2020.

346.   In his role as Regional Director, Simper travelled to various AKPC locations, including Manhattan, Cincinnati, Louisville, Phoenix, Dallas, Garden City, and Smithtown.

347.   Simper was aware that AKPC employees drew multiple syringes containing 2 ml of contrast from a single-use 50 ml vial until the vial was empty.

348.   Simper personally observed this at the various AKPC locations he traveled to, and this was what AKPC was doing when he left AKPC in December 2020.

349.   Muftah Ahmed, M.D. was AKPC's Chief Compliance Officer from November 2020 to January 2022.

350.   In addition to being Chief Compliance Officer, Ahmed was a practicing physician at AKPC's Garden City location, where he personally observed an MA draw multiple syringes of contrast out of a single-use 50 ml contrast vial until was empty, as AKPC had trained her to do.

351.    When Ahmed asked the MA about this practice, she told him that she had drawn multiple syringes out of a single-use vial in front of Rush and that he did not correct her or tell her to do it any other way.

352.    Ahmed realized that, when multiple syringes were being drawn from a single-use vial, AKPC's medical record template—which stated that 2 ml was injected and 48 ml was discarded from a single-use vial—resulted in the creation of false medical records.

353.    Ahmed further realized that this discrepancy between how contrast was used and how it was documented and billed created an overpayment that needed to be adjusted.

354.    Consistent with Rush's overall practice of keeping AKPC's Chief Compliance Officers in the dark, Ahmed was not aware of any discussions or meetings where AKPC management discussed correcting the overpayment that was made due to how contrast was being billed.

355.    Erica Jenkin, AKPC's Vice President of Mid-Level Training, also recognized issues with how AKPC documented and billed for contrast.

356.    In approximately mid-to-late 2022, Jenkin told Rush that providers at AKPC clinics drew multiple syringes from single-use 50 ml vials of contrast, despite claiming the remaining contrast was discarded.

357.    Jenkin told Rush that she was worried about the risk of cross-contamination from drawing multiple syringes from a single-use vial.

358.    Jenkin also told Rush that AKPC needed to change the language in its medical record template because it falsely stated that AKPC providers were discarding the remainder of the vial after administering contrast to a patient when they were not.

359.    Despite Rush being told and knowing that providers at AKPC clinics drew multiple syringes from single-use 50 ml vials of contrast, while claiming the remaining contrast was discarded, Rush, AKPC, LLC, and the AKPC entities identified in Exhibit C continued to knowingly submit or cause the submission of claims for contrast where they expressly falsely certified in the claim that 2 ml of contrast had been administered to a Medicare patient and the unused portion of the single-use vial had been "Discarded/Not Administered to Any Patient" when, in reality, the unused portion had not been discarded and had been administered to other patients.

*Examples of False Billings for Contrast That Was Not Discarded*

360.    For example, Defendants caused the submission of claims to Medicare for contrast for twenty-one beneficiaries with dates of service June 2, 2022 and June 3, 2022, at AKPC's Phoenix, AZ location. Claims for every one of these beneficiaries represented to Medicare that 2 ml of contrast were used, for which Medicare paid in total $28.38, and 48 ml of contrast were discarded, for which Medicare paid in total $681.78. However, 48 ml was not discarded but rather was administered to other patients, for which AKPC billed Medicare as well.

361.    More specifically, on June 2, 2022, a medical provider at AKPC's Phoenix location injected contrast into Medicare patient G.A.'s knee. The corresponding claim for this procedure expressly certified that 2 ml had been administered to patient G.A. and 48 had been discarded. However, the medical provider had injected 2 ml of contrast into G.A.'s knee and the remaining 48 ml had not been discarded; rather, it had been used on other patients, for which AKPC had billed Medicare as well. Rush, Arizona Health Services, PLLC, and AKPC, LLC caused the submission of this false claim to Medicare.

362.    Defendants billed Medicare for contrast claims related to 1,000 injections provided to beneficiaries at AKPC's Cincinnati, Garden City, Smithtown, White Plains, Phoenix, Dallas,

Wall Township, Louisville, Lexington, and Woodlands locations between July 6, 2020 and July 10, 2020.

363.    At AKPC's Garden City, Smithtown, Phoenix, Dallas, and Woodlands locations that week, multiple syringes were drawn on those dates from each 50 ml contrast vial even though representations were made to Medicare that this same contrast had been discarded and not used for other patients.

364.    On information and belief, at AKPC's Cincinnati, White Plains, Wall Township, Louisville, and Lexington locations, multiple syringes were also drawn on those dates from each 50 ml vial of contrast even though representations were made to Medicare that this same contrast had been discarded and not used for other patients.

365.    Rush personally rendered services during this period at AKPC's Smithtown location, where contrast was not discarded as represented in claims to Medicare.

366.    AKPC billed for a full 50 mL single-use vial of contrast for every one of these 1,000 injections. Claims for each injection expressly falsely certified to Medicare that 2 ml of contrast was used, for which Medicare paid in total $523.20, and 48 ml of contrast was discarded, for which Medicare paid $12,564.68. However, if the claims had been billed properly, Medicare would have only paid $523.20 for the contrast that was actually used during those injections and would not have paid $12,564.68 for the contrast that was not actually discarded.

367.    During the Relevant Period, AKPC could purchase single-use vials of contrast in various sizes, including 10 ml, 20 ml, 50 ml, and 100 ml vials.

368.    AKPC purchased vials of contrast in all these sizes at various points in time.

369.    In February 2023, AKPC started billing Medicare more frequently for 100 ml of contrast, representing that 2 ml had been administered and 98 ml had been discarded.

370.    Between February 16, 2023 and December 30, 2024, AKPC billed over 24,000 such claims to Medicare representing that 2 ml had been administered and 98 ml had been discarded.

371.    Defendants billed for contrast for 720 injections provided to beneficiaries at AKPC's Smithtown, Phoenix, Lexington, Wall Township, Dallas, Louisville, Woodlands, Cincinnati, Garden City, Dublin, Columbia, Charlotte, and Alpharetta locations between September 23, 2024 to September 27, 2024.

372.    On information and belief, at all those locations during that week, multiple syringes were drawn from each contrast vial with none being discarded.

373.    AKPC billed for a full 50 mL single-use vial of contrast for 590 of these injections, and for a full 100 mL single-use vial of contrast for 130 of these injections.

374.    Claims for each injection represented to Medicare that 2 ml of contrast was used, and either 48 ml or 98 ml of contrast was discarded.

375.    However, if the claims had been billed properly, Medicare would have only paid $1,811.76 for the contrast that was actually used during those injections and would not have paid $45,283.56 for the contrast that was not actually discarded.

376.    Each of the representative claims identified in Exhibit C were false because Defendants' medical providers had not discarded the unused portion of contrast and instead administered it to other patients.

377.    Each certification in support of the representative claims identified in Exhibit C was false because Defendants' medical providers had not discarded the unused portion of contrast and had administered it to other patients.

378.    Had Medicare known that the contrast Defendants billed as "Discarded/Not Administered to Any Patient" was not in fact discarded and had been administered to other patients, Medicare would not have paid the amount billed.

### iii.    *Defendants Knowingly Retained Overpayments From These False Billings.*

379.    By approximately early 2023—if not sooner—Defendants Rush, AKPC, LLC, and the AKPC entities identified in Exhibit C knowingly and improperly avoided an obligation to pay or transmit money or property to the Government by failing to take any steps to investigate, quantify, report, or return any overpayments related to their false contrast billings after AKPC executives became aware that AKPC had been falsely billing for contrast and had received overpayments.

## CAUSES OF ACTION

### COUNT I

FCA: Causing False Claims to be Presented for Payments
(31 U.S.C. 3729(a)(1)(A))

380.    The United States incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

381.    Defendants knowingly presented or caused to be presented false or fraudulent claims to Medicare for payment or approval, in violation of 31 U.S.C. § 3729(a)(1)(A).

382.    During the Relevant Period, Defendants Rush, AKPC, LLC, and the AKPC entities identified in Exhibit A, with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false, presented or caused to be presented false or fraudulent claims for injections that were medically unreasonable and necessary because they were not provided on the same day as their counterpart injections.

383.    During the Relevant Period, Defendants Rush, AKPC, LLC, and the AKPC entities identified in Exhibit B, with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false, presented or caused to be presented false or fraudulent claims for contrast that was not administered as specified in the claim forms.

384.    During the Relevant Period, Defendants Rush, AKPC, LLC, and the AKPC entities identified in Exhibit C, with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false, presented or caused to be presented false or fraudulent claims for contrast that was not discarded as specified in the claim forms.

385.    The false or fraudulent representations and claims Defendants knowingly made to the United States were material to the United States' decisions to make payments to Defendants.

386.    Because of the above-described conduct, the United States sustained damages in a substantial amount to be determined at trial and is entitled to treble damages plus a civil penalty for each violation.

## COUNT II

### FCA: False Statements Material to False Claims
(31 U.S.C. § 3729(a)(1)(B))

387.    The United States re-alleges and incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

388.    Defendants Rush, AKPC, LLC, and the AKPC entities identified in Exhibits A, B, and C, knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims, in violation of 31 U.S.C. § 3729(a)(1)(B).

389.    During the Relevant Period, Defendants Rush, AKPC, LLC, and the AKPC entities identified in Exhibits A, B, and C with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false, made, used or caused to be made or used, false records or statements material to false or fraudulent claims submitted to the United States, and payment of those false or fraudulent claims by the United States was a reasonable and foreseeable consequence of Defendants' statements and actions.

390.    These false records and statements included false certifications on claim forms that claims for injections were medically reasonable and necessary even though they were not because they were not performed on the same day as their counterparts.

391.    These false records and statements included false certifications on claim forms about how much medical contrast was administered during an injection procedure.

392.    These false records and statements included false certifications on claim forms about how much medical contrast was discarded.

393.    The false records and statements were material to the United States' decisions to make payments to Defendants.

394.    Because of the above-described-conduct, the United States sustained damages, in an amount to be determined at trial, and is entitled to treble damages plus a civil penalty for each violation.

## COUNT III

### FCA: Reverse False Claims
(31 U.S.C. § 3729(a)(1)(G))

395.    The United States re-alleges and incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

396.    Defendants Rush, AKPC, LLC, and the AKPC entities identified in Exhibit A knowingly concealed, avoided, or decreased an obligation to pay or transmit money to the United States related to its false billings for injections that were medically unreasonable and necessary because they were not provided on the same day as their counterpart injections, in violation of 31 U.S.C. § 3729(a)(1)(G).

397.    Defendants Rush, AKPC, LLC, and the AKPC entities identified in Exhibit C knowingly concealed, avoided, or decreased an obligation to pay or transmit money to the United States related to its false billings for contrast that was not administered or discarded as billed, in violation of 31 U.S.C. § 3729(a)(1)(G).

398.    Because of the above-described-conduct, the United States sustained damages in an amount to be determined at trial and is entitled to treble damages plus a civil penalty for each violation.

## COUNT IV

### Federal Common Law: Unjust Enrichment

399.    The United States re-alleges and incorporates by reference each of the preceding paragraphs as if fully set forth here.

400.    Through the acts set forth above, Defendants Rush, AKPC, LLC, and the AKPC entities identified in Exhibits A, B, and C received payments to which they were not entitled and therefore have been unjustly enriched at the expense of the United States.

401.    The circumstances of these payments are such that, in equity and good conscience, Defendants should not retain those payments, the amount of which is to be determined at trial.

## COUNT V

### Federal Common Law: Payment Under Mistake of Fact

402.    The United States re-alleges and incorporates by reference each of the preceding paragraphs as if fully set forth here.

403.    This is a claim for the recovery of monies paid to the following Defendants under mistake of fact: Rush, AKPC, LLC, and the AKPC entities identified in Exhibits A, B, and C.

404.    The above-described false claims and false statements which Defendants submitted to the United States through Medicare constitute misrepresentations of material fact in that they mispresented that injections were medically reasonable and necessary and how much contrast was administered and discarded

405.    As a consequence of the conduct and the acts set forth above, Defendants were paid by mistake by the United States in an amount to be determined at trial which, under the circumstances, in equity and good conscience, should be returned to the United States.

## PRAYER FOR RELIEF

WHEREFORE, the United States demands and prays that judgment be entered in its favor against Defendants as follows:

A.    On Counts I through III under the FCA, for the amount of the United States' damages, in an amount to be determined at trial, trebled as required by law, and such civil penalties as are authorized by law, together with all such further relief as may be just and proper.

B.    On Count IV for unjust enrichment and Count V for payment under mistake of fact, for the damages sustained and/or amounts by which Defendants were unjustly enriched or mistakenly paid, or retained illegally, plus interest, costs, and expenses, and for all such further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

The United States demands a jury trial in this case.

Respectfully submitted,

MICHAEL A. BENNETT
United States Attorney

MATT WEYAND
JESSICA R. C. MALLOY
Assistant United States Attorneys
717 West Broadway
Louisville, Kentucky 40202
Phone No. (502) 582-5911
Fax No. (502) 625-7110
Matt.Weyand@usdoj.gov
Jessica.Malloy@usdoj.gov